DISTRICT OF COLUMBIA HOSPITAL ASSOCIATION, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

No. CIV. A. 98–2575(SS).

United States District Court, District of Columbia.

Oct. 29, 1999.

Ronald Nelson Sutter, Powers, Pyles, Sutter & Verville, P.C., Washington, DC, for the District of Columbia Hospital Association, Children's Hospital National Medical Center, Greater Southeast Community Hospital, Howard University Hospital, Providence Hospital, Hadley Memorial Hospital, Psychiatric Institute of Washington, Inc., the Hospital for Sick Children, plaintiffs.

Jacques Philippe Lerner, Office of Corporation Counsel, D.C., Washington, DC, for District of Columbia, Paul Offner, Deputy Director for Health Care Finance of Medical Assistance Administration, defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on the following motions filed by the plaintiffs: (1) Motion to Compel Defendants to Comply With Representations Made to the Court and (2) Motion for Summary Judgment. The defendants have also filed a Cross–Motion for Summary Judgment and a Motion for Judgment on the Pleadings.

## BACKGROUND

Plaintiffs are the District of Columbia Hospital Association ("DCHA") and its non-public member hospitals that serve a disproportionate share of low-income patients. Defendants, the District of Columbia and the Deputy Director for Health Care Finance of the Medical Assistance Administration, are responsible for the administration of the District of Columbia Medicaid program. In accordance with Title XIX of the Social Security Act, commonly known as the Medicaid statute, the

District of Columbia has devised a plan to reimburse qualifying hospitals for inpatient services furnished to individuals meeting Medicaid eligibility requirements.[1] Hospitals that serve a disproportionate share of low-income patients are known as a disproportionate share hospital ("DSH") and are entitled to an additional Medicaid payment. This adjustment is commonly referred to as a DSH payment.

Under the Medicaid statute, states must choose one of three payment options for calculating the DSH adjustments. 42 U.S.C. § 1396r–4 (c). In 1992 the agency in charge of the District's Medicaid program, the Medical Assistance Administration ("MAA"), choose option (c)(1), which is still in effect today. Under this option the DSH adjustment equals at least the product of (A) a base amount times (B) a percentage. The base amount is "the amount paid under the [Medicaid] State plan to the hospital for operating costs for inpatient hospital services..." 42 U.S.C. § 1396r–4 (c)(1)(A). The percentage is "the hospital's disproportionate share adjustment percentage" established under Section 1886(d)(5)(F) (iv) of the Social Security Act, 42 U.S.C. § 1395ww (d)(5)(F)(iv). 42 U.S.C. § 1396r–4 (c)(1)(B).[2]

In 1992, the District of Columbia enacted legislation requiring those who qualify for Medicaid under the Aid to Families with Dependent Children program be enrolled in Medicaid managed care plans.[3] The Medicaid managed care program was implemented in late 1993 and early 1994. Following the implementation of this legislation, defendants advised the plaintiffs that, pursuant to the new legislation, they did not intend to make any DSH payments with respect to Medicaid managed care services. On April 26, 1994, plaintiffs filed suit in this Court challenging the legality of this policy. Specifically, the plaintiffs asserted that the District's failure to ensure direct DSH payments to DSHs for services furnished to Medicaid managed care patients conflicted with the Medicaid statute.

Shortly after the filing of the plaintiffs' suit, the defendants reversed their position. At a May 2, 1995 hearing, the defendants represented to this Court that managed care costs *would* be included in the DSH calculation. In making this representation the defendants relied on the deposition testimony of then acting Medicaid Commissioner, A. Sue Brown, whose sworn testimony disavowed the defendants' original litigation position. Specifically, Ms. Brown testified that the District's Medicaid plan did not exclude medical care services provided in conjunction with the Managed Care program for the purpose of disproportionate share calculations. The defendants subsequently informed the court that Ms. Brown's deposition testimony represented the policy of the district, and that, from that point on there would be no exclusions for Medicaid managed care when calculating the

1. Medicaid authorizes federal grants to states to provide medical assistance to low-income persons who are aged, blind, disabled, or members of families with dependent children. 42 U.S.C. § 1396. This program, jointly financed by the federal and state governments, is administered by the states. *See Wilder v. Virginia Hospital Association,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

2. The disproportionate share adjustment percentage is calculated as the sum of two fractions: the Medicare fraction and the Medicaid fraction. The Medicare fraction is found by dividing (1) a hospital's patient days attributable to Medicare patients who qualify for supplemental security income ("SSI") under title XVI of the Social Security Act by (2) a hospital's total Medicare patient days. 42 U.S.C. § 1395ww (d)(5)(F)(vi)(I).

The Medicaid fraction is yielded by dividing (1) a hospital's patient days attributable to patients eligible for Medicaid by (2) a hospital's total patient days. 42 U.S.C. § 1395ww (d)(5)(F)(vi) (II). The sum of these two fractions is the disproportionate patient percentage. Additional factors set forth in the statute are applied to the disproportionate patient percentage to calculate the disproportionate share adjustment percentage.

3. Medicaid Managed Care Amendment Act of 1992, D.C. Law 9–247, D.C.Code § 1–359(d).

DSH payments. Acting on these representations, and with the consent of the plaintiffs, the court dismissed the action without prejudice as moot.

In the Fall of 1997, the MAA calculated the Medicaid DSH payments for qualifying hospitals for fiscal years 1992–1997 using the formula agreed to by the parties in the 1994 litigation. The District subsequently made one payment to the hospitals based on the agreed upon formula in September 1997. In the Spring of 1998, the MAA recalculated and adjusted the DSH payments using a new formula that excluded Medicaid managed care services in the base amount.

On August 26, 1998, plaintiffs filed the instant action. In it they challenge the defendants' failure to make DSH payments for Medicaid managed care services on two grounds. First, they claim defendants' failure breaches the representations the District made to the Court and to the plaintiffs in the prior litigation concerning the inclusion of Medicaid managed care payments in the DSH calculation. Second, they claim defendants failure to include Medicaid managed care payments in the base amount of the DSH calculation is a violation of the plain language of the Medicaid statute and the District's Medicaid State plan. They seek a declaration that the defendants' current policy of excluding Medicaid managed care payments from their calculations of plaintiffs' DSH entitlements is contrary to law and an order requiring defendants to recompute the plaintiffs' Medicaid DSH entitlements and pay them all additional amounts to which they are entitled under the revised calculations. Plaintiffs also ask for the award of costs, attorneys fees and any additional relief the court deems appropriate.

### ANALYSIS

#### I. Defendants' Judgment on the Pleadings

After the first day of hearings in July 1999 Defendants filed a Motion for Judgment on the Pleadings. In it they assert the plaintiffs are barred from presenting their claims by the doctrine of res judicata and by Fed.R.Civ.P. Rule 60. They also claim this court lacks subject matter jurisdiction over plaintiffs' breach claim.

The doctrine of res judicata precludes a party from "relitigating issues that were or could have been raised" in a previous action dismissed pursuant to a final judgment on the merits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Res Judicata does not, however, bar a party or parties from relitigating a previously asserted claim dismissed on justiciability grounds. *Cutler v. Hayes*, 818 F.2d 879, 888 (D.C.Cir.1987). This Court dismissed the plaintiffs' prior lawsuit as moot after being advised by the defendants that there was no need to proceed farther as plaintiffs' demands had been met. The merits of plaintiffs' claims were never tested. Accordingly, as the prior lawsuit was dismissed on justiciability grounds, plaintiffs are not barred from relitigating the issue of whether defendants' exclusion of Medicaid managed care payments from the DSH calculation is lawful.

Defendants' second ground for dismissal is that plaintiffs exclusive remedy for asserting the breach of representations claim is a motion for relief from judgment or order made pursuant to Fed.R.Civ.P. Rule 60(b). Rule 60(b) allows a court to relieve a party from a final judgment or order on the basis of "misrepresentation, or other misconduct of an adverse party". Rule 60 motions must be made within one year of the entering of the judgment. Defendants maintain that since plaintiffs failed to bring a Rule 60 motion within the statutory time period, they may not now bring an independent action to enforce the defendants' previously asserted representations to the court.

In 1998, after becoming aware of the District's policy reversal with respect to calculating DSH payments, Plaintiffs chose to initiate a new lawsuit against the defendants. The current suit is not an attempt

to set aside the court's previous order dismissing the suit (as would be appropriately made under Rule 60(b)), but rather is a wholly new, and different, action to enforce the defendants' representations. Thus plaintiffs are not barred from bringing the instant action by Rule 60(b).

■ Lastly, defendants claim this court lacks jurisdiction over plaintiffs' current breach claim. Defendants maintain that the 1995 dismissal was based upon a settlement agreement, and that only the D.C. Superior Court has jurisdiction to enforce settlement agreements. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380, 114 S.Ct. 1673, 128 L.Ed.2d 391.

■ The prior lawsuit was dismissed pursuant to an order of this court that the case was moot. It was not dismissed pursuant to a stipulation of settlement, nor did the order refer to, nor incorporate the terms of any, settlement agreement. Accordingly, on this ground alone, defendants' jurisdictional objection is denied. However, even had the court dismissed the prior suit pursuant to a settlement, this court would still have independent subject matter jurisdiction over plaintiffs' claims. First, plaintiffs' statutory claim arises under the Medicaid statute, the enforcement of which creates a federal question within the jurisdiction of the federal courts. *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Second, jurisdiction over plaintiffs' breach claim is necessary to enforce a prior order of this court, based as it was on the defendants' representations that the plaintiffs' concerns had been met. Courts may exercise ancillary jurisdiction "to enable a court to . . . manage its proceedings, vindicate its authority, [and] effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380, 114 S.Ct. 1673, 128 L.Ed.2d 391. Thus, this court could rely on its inherent power to vindicate its authority and effectuate its prior order in order to address plaintiffs' current breach claim.

## II. The Statutory Issue

Plaintiffs assert the defendants' current policy of excluding Medicaid managed care services from the base element when calculating the DSH payment contravenes the clear language of the Medicaid statute. Defendants maintain the Medicaid statute gives states discretion to include or exclude those costs as they see fit.

The relevant portion of the Medicaid statute in this case provides that the DSH payment adjustment must:

> be in an amount equal to at least the product of (A) the amount paid under the State plan to the hospital for operating costs for inpatient hospital services (of the kind described in section 1395ww (a)(4) of this title), and (B) the hospital's disproportionate share adjustment percentage (established under section 1395ww (d) (5)(F)(iv) of this title).

42 U.S.C. § 1396r–4 (c)(1).

"Operating costs" is defined in 42 U.S.C. § 1395ww (a)(4) as including "all routine operating costs, ancillary service operating costs, and special care unit operating costs with respect to inpatient hospital services . . ." Other costs, such as approved educational activities, a return on equity capital, or costs with respect to administering blood clotting factors to hemophiliacs are not included in the term operating costs. 42 U.S.C. § 1395ww (a)(4).

■ Defendants assert two principal grounds in support of their position that they may exclude costs incurred by Medicaid managed care patients from the base amount when calculating the DSH payment. First, they maintain that the payments hospitals receive for Medicaid managed care services are not amounts "paid under the State plan to the hospitals". Defendants contend that it is the managed care organizations, rather than the states, that reimburse the hospitals for the operating costs associated with managed care patients. As a result, the District asserts, the statute does not require the defen-

dants to include these payments in their DSH calculations.

The fact that the hospitals are not paid directly by the state for the costs incurred in servicing managed care patients is immaterial. The statute does not refer to amounts paid directly to the hospitals by the state, but only to amounts paid "under the state plan". 42 U.S.C. § 1396r–4(c)(1)(A). While the managed care organizations do make direct payments to the hospitals, such payments originate with the state. The state initially provides the funds to the managed care organizations who then negotiate with the hospitals for the amounts paid to them for the costs of inpatient services furnished to managed care patients. Thus, payments for costs associated with Medicaid managed care patients are amounts paid by the state and clearly come within the statutory definition of amounts paid under the state plan to the hospitals.

■ As a second ground, defendants maintain ·they have discretion to decide how to calculate the base amount. They base this contention on a General Accounting Office ("GAO") letter written in 1998 by William J. Scanlon, Director, Health Financing and Systems Issues. The GAO letter reports on the practices of a number of states in determining the maximum amount of DSH payment a hospital may receive under the Medicaid statute. In summarizing the differing approaches of the various states analyzed, the letter states that the Health Care Finance Administration ("HCFA") and the Medicaid statute allow states discretion in choosing how to calculate the maximum DSH payment.

Defendants rely on this letter as authority for their position that they may legally exclude Medicaid managed care costs from the base amount when calculating a hospital's DSH payment. Defendants' reliance on this letter is misplaced. First, the GAO report is not, and does not purport to be, a legal analysis of the statute. It merely summarizes the current practices of a number of states, offers an opinion as to the legality of such practices, and sets forth HCFA's current policy with respect to the issue. More importantly, however, the report is irrelevant to the issue presented in this case. The report concerns 42 U.S.C. § 1396r–4(g), the statutory provision dealing with the maximum DSH payment allowable under the Medicaid statute. It does not address the statutory provision at issue in this case, which is 42 U.S.C. § 1396r–4 (c)(1). This statutory provision is clear and does not include a provision excluding Medicaid managed care services from the base amount.

■ Lastly, defendants position on its face is without merit. Defendants concede that Medicaid managed care patients are "eligible for medical assistance under a State plan". Consequently, when calculating the disproportionate share adjustment percentage in the numerator of the Medicaid fraction, defendants include Medicaid managed care patient days. However, when calculating the base amount they exclude the payments received by the hospitals for serving these same patients. It simply defies logic and common sense to include Medicaid managed care patient days as patient days for the purpose of computing one side of the DSH equation, while simultaneously excluding the payments received by hospitals for serving Medicaid managed care patients when calculating the other.

### III. Motion to Compel

■ Plaintiffs allege that the defendants current policy of excluding Medicaid managed care services from the base amount when making DSH adjustments to qualifying hospitals directly contradicts their stated position in 1995. Defendants disagree. According to the District, the prior litigation addressed only one side of the equation: the calculation of the percentage. Accordingly, defendants maintain, they never made any representations with respect to the current issue.

On July 29, 1999 and October 8, 1999 this court held hearings to determine the exact nature of the District's prior representations. Present at the July 29, 1999 hearing as witnesses for the plaintiffs were: A. Sue Brown, the Acting Commissioner of the Commission on Health Care Finance in 1994; Ms. Terry Thompson Mallett, deputy to Acting Commissioner Brown and Deputy General Counsel for the Department of Human Services during the time of the prior litigation; and Amy Hancock, plaintiffs' attorney in the 1994 litigation.

At the July 1999 hearing Ms. Brown testified that the current position of the District to exclude Medicaid managed care services from the base amount when calculating DSH payments contradicts the defendants' prior representations to the court. Specifically, Ms. Brown stated that "the intent during the settlement was to treat the managed care patients as regular managed care Medicaid patients. There were to be no exclusions because they were in managed care." Tr. 7/29/99 at 18–21. In Ms. Brown's opinion, the district's Medicaid plan requires that the defendants treat Medicaid managed care services and patients and non-managed care Medicaid services and patients the same.

The testimony of Ms. Terry Thompson Mallett corroborated that of Ms. Brown's. Ms. Mallett testified that her understanding of the plaintiffs' position in the earlier lawsuit was that the "hospitals were seeking to have managed care counted in the disproportionate share payments the same way that regular fee-for-service Medicaid was counted". She further testified that the District's current policy flatly contradicts that position. The intent of the District in 1995 when the previous litigation was dismissed, Ms. Mallett stated, was to treat managed care Medicaid services and managed care Medicaid patient days the same as all other Medicaid services and patient days. Ms. Mallett concurred with Ms. Brown that the District's current exclusion of Medicaid managed care services

from the base amount contradicts the District's previous representations.

Ms. Sue Hancock, the plaintiffs' attorney in the 1994 litigation, testified as to her understanding of the issues involved in the prior lawsuit. According to Ms. Hancock's testimony, the plaintiffs purpose was to establish that there was "no distinction between managed care and non-managed care" for purposes of the DSH calculations. Ms. Hancock stated that the plaintiffs made no distinction between the two components of the DSH calculation in the previous suit.

At the second day of the hearing the court heard testimony from Paul Offner, the current Medicaid Commissioner for the District of Columbia and Justin Draycott, the District's attorney in the former litigation. Mr. Offner testified that the District's 1998 decision to recalculate the hospitals' DSH payments was based solely on budgetary considerations. Specifically, Mr. Offner testified that the District's sole motivation in excluding Medicaid managed care services from the base amount was to reduce the amount of money it owed the private disproportionate share hospitals for the period of 1992–1997.

The court heard last from Mr. Draycott. Mr. Draycott testified that it was his understanding of the 1994 lawsuit that the plaintiffs were only challenging the calculation of the DSH percentage. However, in the Defendants' March 20, 1995 Motion to Dismiss in the previous lawsuit, the District stated that "in calculating the reimbursement rates for hospitals based on their provision of medical services to eligible Medicaid recipients, the acting Commissioner has specifically stated that the District's state plan does not exclude medical care services provided in conjunction with the Managed care program for the purpose of disproportionate share calculations". This statement is quite clear, and supports the plaintiffs' contention that amounts paid to the hospitals for the costs of providing inpatient care to Medicaid managed care patients was an issue con-

templated in the prior suit. While it may be Mr. Draycott's current recollection that the issue of how to calculate the base amount was not contemplated in the prior suit, the papers filed on behalf of the District certainly seem to indicate that it was.

This court credits the testimony of the District's former Commissioner, her deputy and Ms. Hancock and finds that the District has breached its promise to the parties and the court to treat Medicaid managed care patients and services the same as other Medicaid patients and services for the purpose of calculating the DSH.[4] Both Ms. Brown and Ms. Mallett, the administrators in charge of the District's Medicaid plan, believed that the District's plan required such equal treatment. It was their understanding in 1995, as well as that of the plaintiffs' former attorney and this Court, that the District intended to meet the demands of the plaintiffs and to make no exclusions for Medicare managed care. It was for this reason that the prior suit was dismissed as moot.

It now appears that this Court was misled. The plaintiffs' complaint today is identical to that presented in the 1994 litigation. Now, as in 1994, the District is excluding Medicaid managed care services from the calculation of the DSH payments. The District's explanation for this exclusion, that it is experiencing budgetary restrictions, in no way provides an adequate rationale for its actions. The defendants' current position is contrary to the District's prior representations to this court, contrary to the specific terms of the Medicaid statute, and contrary to common sense.

Based on these findings, the court finds the defendants are not in compliance with their prior representations made to this court, nor with their legal duties as set forth in the governing Medicaid statute. The District of Columbia has not acted in good faith in this litigation. In 1994, when this action was first filed, counsel for the District of Columbia represented to this Court that it had acceded to the demands of the plaintiffs and that the lawsuit should be dismissed as moot. Based on this representation, the suit was dismissed. For a time after this case was dismissed, the City did, in fact, make the payments consistent with the representations made to this Court. These payments ceased in 1998 based on the City's position that it simply wanted to save money. At no time was the Court advised of the City's changed position. Instead, it waited for the plaintiffs to return to court to enforce the representations made by the City.

 The Corporation counsel's office has not distinguished itself in these proceedings. It has unnecessarily taken the time of this Court with bogus and frivolous arguments. There is no doubt that the City wanted to save money by not paying the plaintiffs what was legally and fairly owed to them. The Corporation Counsel's

---

4. A simple illustration belies the absurdity of the defendants' position. Suppose, for example, that there are two DSHs, hospital A and hospital B. Both receive Medicaid payments of $1 million with respect to operating costs for furnishing inpatient hospital services to Medicaid patients. Both have a disproportionate share adjustment percentage of 30%. The only difference between the two is that all of Hospital A's Medicaid patients are non-managed care patients, while all of Hospital B's are managed care.

Using the district's current methodology Hospital A would receive a DSH payment of $300,000 calculated as follows: $1,000,000 (base amount) × 30% (percentage) = $300,000.

Hospital B's DSH payment, however, would be zero calculated as follows: $0 × 30% = 0. Because the district does not include services for Medicaid managed care patients, the amount in the base amount for Hospital B is zero. For a hospital that has all Medicaid managed care patients, the DSH payment will always be zero, irregardless of the percentage, as zero times any number is always zero. It simply defies common sense to believe that the plaintiffs would have sued to require the District to include Medicaid managed care on one side of the equation, when the result of excluding it from the other, would nullify the entitlement entirely.

Office supported its client's inappropriate position by appearing in Court and presenting a totally baseless legal position. The City's lawyer should have refrained from participating in such conduct. Despite the urging of its client, the Corporation Counsel's Office must resist those urgings and refuse to appear in court and present arguments that are inappropriate. What was particular disturbing was the allegation of counsel that the former Acting Health Care Commissioner's testimony should not be credited because she had recently involuntarily left her City position. To claim that a former city official would give the Court misleading and possibly perjurious testimony based solely on the basis alleged, without more, is without justification. This is particularly so since the former Acting Commissioner's testimony in the current proceeding was fully consistent with her deposition in the earlier 1995 action. Thus, the City's "win at any cost strategy" has besmirched the character and reputation of a former high level city official in a reckless and baseless manner.

The City's Corporation Counsel must see to it that actions of this kind are not repeated. Accordingly, the Corporation Counsel, or the individual presently acting as such, shall appear before this Court to state why sanctions under Rule 11 should not be imposed. An appropriate order accompanies this Memorandum Opinion.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment is **GRANTED**; and it is

**FURTHER ORDERED** that Plaintiffs' Motion to Compel is **GRANTED**; and it is

**FURTHER ORDERED** that Defendants' Motion for Judgment on Pleadings is **DENIED**; and it is

**FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **DENIED**; and it is

**FURTHER ORDERED** that the defendants shall immediately, within FIVE (5) days of the receipt of this Order, reimburse the hospitals for the amounts owed, plus interest, and pay the Plaintiffs' costs and reasonable attorney fees; and it is

**FURTHER ORDERED** that all other pending motions in this case are **DENIED** as **MOOT**.

And it is **FURTHER ORDERED** that the Corporation Counsel, or the individual presently acting as such, shall appear in court at 11:30 a.m. on November 15, 1999 to state why appropriate sanctions under Rule 11 of the Federal Rules of Civil Procedure shall not be imposed.